**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ZORRO PRODUCTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-5761 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE INDIVIDUALS, CORPORATIONS, | ) | |
| LIMITED LIABILITY COMPANIES, | ) | |
| PARTNERSHIPS, AND | ) | |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE A | ) | |
| HERETO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Zorro is known for his stealth. He wears a mask, dons an all-black costume, sneaks around, and pops out of nowhere on his unsuspecting, soon-to-be-swashbuckling foes. As the complaint puts it, "[t]he character of ZORRO is one of the earliest examples of a fictional masked hero with a double identity." *See* Cplt., at ¶ 7 (Dckt. No. 1); *see also* Zorro, *Wikipedia* (describing Zorro as a "master of escape and camouflage"); *id.* (identifying *The Curse of Capistrano*, a Zorro book, as "one of the best-selling books of all time," with more than 50 million copies sold); *watch generally* The Mask of Zorro (1920) (starring Douglas Fairbanks). He strikes without warning, lurking in the shadows and using the element of surprise to his tactical advantage.

In that spirit, the owners of the Zorro trademarks now seek to take a page out of his book, and strike with stealth of their own. The owners of Zorro filed a complaint against hundreds of would-be counterfeiters, seeking damages for ripping off their intellectual property by selling fake Zorro goods. The list includes fake Zorro lighters, socks, masks, t-shirts, hoodies, onesies, leggings, mugs, hats, greeting cards, and throw pillows. And in the meantime, they ask for a temporary restraining order.

But they don't make that request out in the open. Instead, they request an ex parte TRO, and they filed a motion to seal, too. They want to seal the so-called "Schedule A" to the complaint, which is a list of 310 defendants and their websites. They also ask to seal the screenshots of the infringing websites attached to a declaration in support of the TRO.

In essence, the owners want to sneak up on the defendants and strike a blow to their counterfeiting operation, and do so under the cover of darkness. They want relief without giving defendants a chance to see what hit them – just like Zorro himself.

Judges, too, wear black. But by and large, the judiciary does its work out in the open. The entrance to the courthouse is open to the public every day, and so are the doors to each courtroom. The docket is publicly available, too. Anyone can see what the judiciary is up to, including who is asking the court for what, and how the judiciary responds.

From beginning to end, the public gets a chance to see what is happening – before, during, and after a ruling. Motions typically appear on the public docket, and hearings usually are posted in advance. Hearings take place in public. And after the fact, the public can see how the court ruled. Transparency builds confidence, promotes accountability, and leads to fair outcomes for the parties.

The tradition of openness is deeply woven into the fabric of the judiciary. "Secrecy in judicial proceedings . . . is disfavored." *Mueller v. Raemisch*, 740 F.3d 1128, 1135 (7th Cir. 2014); *see also Mitze v. Saul*, 968 F.3d 689, 692 (7th Cir. 2020) (per curiam) (noting that "a strong presumption exists in favor of publishing dispositional orders"); *Duff v. Cent. Sleep Diagnostics, LLC*, 801 F.3d 833, 844 (7th Cir. 2015) (noting that "secrecy in judicial proceedings is generally disfavored").

"Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010). Documents that "influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Baxter Int'l, Inc. v. Abbott Lab'ys*, 297 F.3d 544, 545 (7th Cir. 2002); *see also Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000) ("Even disputes about claims of national security are litigated in the open.").

"The reason for this right of public access to the judicial record is to enable interested members of the public, including lawyers, journalists, and government officials, to know who's using the courts, to understand judicial decisions, and to monitor the judiciary's performance of its duties." *Goesel v. Boley Int'l (H.K.) Ltd.*, 738 F.3d 831, 833 (7th Cir. 2013). "Information that affects the disposition of litigation belongs in the public record unless a statute or privilege justifies nondisclosure." *See United States v. Foster*, 564 F.3d 852, 853 (7th Cir. 2009).

A party who wants to depart from that longstanding tradition, and litigate in secret, must carry a heavy burden. And on this record, the owners of Zorro are fighting a losing battle.

Plaintiff's explanation for the request for secrecy is rather terse. "Sealing this portion of the file is necessary to prevent the Defendants from learning of these proceedings prior to the execution of the temporary restraining order. If Defendants were to learn of these proceedings prematurely, the likely result would be the destruction of relevant documentary evidence and the hiding or transferring of assets to foreign jurisdictions, which would frustrate the purpose of the

underlying law and would interfere with this Court's power to grant relief." *See* Mtn. to Seal (Dckt. No. 3).

Anyone familiar with the torrent of filings in Schedule-A-Land will recognize that lingo. The Zorro case isn't unique. In fact, the Zorro lawsuit is one of hundreds of "Schedule A" cases that have rained down on this district. Each year, the Schedule A bar files hundreds of counterfeiting cases in this district against foreign sellers, who peddle fake goods on the internet. "It has become the Northern District of Illinois vs. The Internet." *See BRABUS GmbH v. Individuals Identified on Schedule A Hereto*, 2022 WL 7501046, at *1 (N.D. Ill. 2022).

For whatever reason, the Schedule A bar has settled on the friendly confines of the Northern District of Illinois as ground zero for lawsuits about foreign counterfeiters. The volume of Schedule A cases in this district is extraordinary. As an illustration, one law firm alone files more than 300 Schedule A lawsuits in Chicago each year.

The factories churning out fake goods are rivaled by the factories of law firms churning out Schedule A case after Schedule A case. By and large, the Schedule A bar uses the same template in each case, treating the filings like a factory mold. They change a few names, tinker here and there, and then kick out a new complaint for a new client. It's a cut-and-paste mass assembly operation that would make Henry Ford himself feel proud. And the Northern District of Illinois has turned into an assembly line for TROs.

The draft language in the proposed TRO reflects that reality. The owners of Zorro offer the same cut-and-paste boilerplate that is pressed into service in countless Schedule A cases, often word for word.

In fact, this Court recently resolved motions to seal in more than 20 Schedule A cases, all of which used the exact same lingo. *See, e.g.*, *Chrome Hearts LLC v. The Partnerships and Unincorporated Associations Identified on Schedule A*, Case No. 23-cv-1461 (N.D. Ill.); *Art Ask Agency v. The Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A*, Case No. 23-cv-2163 (N.D. Ill.); *Toho Co., Ltd. v. The Partnerships and Unincorporated Associations Identified on Schedule A*, Case No. 23-cv-4276 (N.D. Ill.). Three different law firms filed those three Schedule A cases, and all three law firms used identical language in their motions to seal.

Here, the owners of Zorro give no concrete reason to think that the sellers of fake Zorro goods would destroy documents in this particular case. As a practical matter, defendants typically don't produce documents in Schedule A cases anyway. Almost all of them fail to participate in the suit and eventually get tagged with a default judgment.

The simple reality is that defendants in Schedule A cases tend to be foreign sellers who do not produce documents at all. Sealing a case to protect documents is likely to be a moot point. Also, the possibility of document destruction is not much of a basis for sealing documents in the short term, because Plaintiff apparently plans to move to unseal the documents after serving the TRO.

3

The fact that Plaintiff wants a temporary restraining order to prohibit counterfeiting isn't much of a reason for a stealthy request, either. Plaintiff wants Defendants to stop selling counterfeit goods. The owners of Zorro want the foreign sellers to knock it off when it comes to selling knock-offs. An order prohibiting counterfeiting won't do much good unless Defendants are told to stop counterfeiting. An order to stop counterfeiting requires publicity, not secrecy.

The last reason for secrecy is the request for an asset freeze. But the possibility of transferring assets offshore isn't much of a reason to proceed in secret in a Schedule A case.

Filing an ex parte motion for an asset freeze does make sense in certain types of cases. For example, the SEC often seeks a TRO to lock down assets that do not rightfully belong to the defendants (*e.g.*, by suing a fraudster who holds investors' money).

In those cases, the SEC typically files a motion for an asset freeze and a TRO under seal, and rightly so. Making the request under seal makes sense in those cases, because the alleged fraudster could dissipate the investors' assets if the fraudster learns about the lawsuit. Locking down the assets – without giving the fraudster a heads-up – helps to protect investors and preserve the possibility of obtaining meaningful equitable relief at the end of the case. *See CFTC v. Lake Shore Asset Mgmt. Ltd.*, 496 F.3d 769, 772–73 (7th Cir. 2007). Prospective equitable relief protects the possibility of retrospective equitable relief. Equity now preserves equity later.

A motion to seal often makes sense when the plaintiff seeks an asset freeze to secure the potential recovery of future equitable monetary relief. Secrecy is sometimes necessary to preserve the possibility of obtaining equitable relief down the road. The reality is simple: seal it and seize it, or say goodbye.

But in Schedule A cases, the plaintiffs' bar typically seeks remedies at law – such as statutory damages – not equitable monetary relief. The request for a remedy at law, not a remedy in equity, affects the calculus when it comes to an asset freeze.

The Supreme Court has made clear that courts lack the power to issue an asset freeze at the beginning of a case, unless that party is seeking equitable monetary relief. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). In *Grupo Mexicano*, the Supreme Court held that a district court has "no authority to issue a preliminary injunction preventing [a defendant] from disposing of their assets pending adjudication of [plaintiff's] contract claim for money damages." *Id.* at 333.

The Supreme Court reinforced the long-standing rule that "a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property." *Id.* at 321. "[A]s a general matter [] prejudgment asset restraints are not proper simply to establish a fund from which a later award of money damages can be satisfied." *See Banister v. Firestone*, 2018 WL 4224444, at *9 (N.D. Ill. 2018).

An equitable restraint on day one might be doable if a plaintiff requested and received equitable monetary relief at the end of the case, like restitution or disgorgement of ill-gotten gains. *See Deckers Outdoor Corp. v. Unincorporated Associations Identified on Schedule A*,

2013 WL 12314399 (N.D. Ill. 2013); *see also* 1 D. Dobbs, Law of Remedies § 4.1(1) (2d ed. 1993) ("Restitution measures the remedy by the defendant's gain and seeks to force disgorgement of that gain. It differs in its goal or principle from damages, which measures the remedy by the plaintiff's loss and seeks to provide compensation for that loss.").

But as a practical matter, in Schedule A cases, that recovery almost never happens. Schedule A plaintiffs typically don't request and receive equitable monetary relief.

Instead, Schedule A plaintiffs rush into court, request and receive an asset freeze, and obtain a default judgment. And then, the Schedule A plaintiffs ask district courts to unfreeze the money and award statutory damages, not equitable relief. In that scenario, it is not clear to this Court that it would be appropriate to use any frozen funds for any recovery of statutory damages, because statutory damages are a remedy at law, not a remedy in equity.

Truth be told, the Schedule A plaintiffs' bar asks courts in this district to lock down assets through an asset freeze on day one of a case, and do so under seal. And then, at the end of the case, Schedule A plaintiffs simply ask the Court to bless an order requiring third parties to hand over all of the frozen funds. The Schedule A plaintiffs receive a remedy at law, not a remedy in equity, which means that there was no justification for an asset freeze in the first place.

Putting it all together, this Court might entertain a request to file under seal if the owners of Zorro were seeking an asset freeze that this Court could grant, meaning an asset freeze for the limited purpose of allowing equitable relief down the road. But in the case at hand, Plaintiff has not made a showing that it will seek equitable monetary relief at the end of the case, so there is no basis for an asset freeze now.

If there is no basis for an asset freeze now, then there is no reason to proceed under seal now. If you can't freeze it, you can't seal it.

In the end, the owners of Zorro may want to litigate under the cover of darkness, and use stealth to their advantage against their adversaries. But the tradition for the judiciary is sunshine, not darkness. And on this record, the request for emergency relief needs to see the light of day. The motion to seal is hereby denied.

Date:  December 20, 2023

_____

Steven C. Seeger
United States District Judge